## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re:  Case No. A09-00196-DMD | Chapter 11 |
| ALASKA FUR GALLERY, INC., | |
| Debtor. | |
| ALASKA FUR GALLERY, and HERNANDEZ & ASSOCIATES, LLC, | Adv. No. A10-90001-DMD |
| Plaintiffs, | |
| v. | |
| FIRST NATIONAL BANK ALASKA, | |
| Defendant. | |

Filed On
9/28/11

### MEMORANDUM ON DEFENDANT'S CLAIMS NOS. 25 AND 27

Plaintiff Alaska Fur Gallery, Inc. ("AFG") filed its complaint to determine lien on January 10, 2010.  On December 8, 2010, this court entered an order abstaining from hearing this adversary proceeding or any matters pertaining to Proofs of Claim Nos. 24, 25, 26, 27, 28, 29 and 30, filed by defendant First National Bank Alaska ("FNBA"), pending the entry of final judgment in Alaska Superior Court Case No. 3AN-06-6120-CI.[1]  Although a second trial was held in the state court action in late 2010, a final judgment has not yet been entered nor is one expected to be entered in the near future.  At the confirmation hearing held in the main case in July of 2011, the parties to this adversary proceeding asked this court to

---

[1] Order Regarding Abstention, entered Dec. 8, 2010 (Docket No. 34).

determine one discrete issue with regard to FNBA's Claims Nos. 27 and 25 (Classes S-1A and S-1B, respectively, of the debtor's confirmed plan). Specifically, they requested a ruling on the issue of whether those two claims are secured by the debtor's business personal property.[2] In light of this request, and given the delay in the state court adjudication, the court will address this sole issue.

Jurisdiction and Controlling Law

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), as it is a matter involving the allowance of claims against the estate. Further, this court has the constitutional authority to determine the issues presented here. Although these issues are raised in the context of a suit the debtor has brought against one of its creditors, that creditor has filed proofs of claim in this bankruptcy case and the issues to be determined "would necessarily be resolved in the claims allowance process."[3]

"'Property interests are created and defined by state law.'"[4] The issues raised here involve interpretation of a security agreement executed between the parties and the scope of a claimed security interest. The Alaska Uniform Commercial Code and applicable state law regarding contract interpretation will govern their resolution.

---

[2] Am. Order Confirming AFG's Modified Sixth Am. Plan of Reorg., entered Aug. 2, 2011 in *In re Alaska Fur Gallery*, Main Case No. A09-00196-DMD (Docket No. 393), at 3.

[3] *Stern v. Marshall*, ___ U.S. ___, 131 S.Ct. 2594, 2618 (2011).

[4] *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 451 (2007); *quoting Butner v. United States*, 440 U.S. 48, 55 (1979).

2

Background of Claims

FNBA's Claim No. 27 was filed as a secured claim for $674,553.39. This claim is based upon a loan in the principal amount of $800,000.00 which FNBA extended to AFG on March 18, 2003.[5] The note is secured by a first deed of trust against real property located at 317 South Franklin Street in Juneau, Alaska.[6] It was recorded in the Juneau Recording District on March 19, 2003.[7] On its first page, the deed of trust contains a cross-collateralization provision which provides:

> **CROSS-COLLATERALIZATION.** In addition to the Note, this Deed of Trust secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the

---

[5] FNBA's Claim No. 27-1, filed Jun. 1, 2009, at 3 (Promissory Note).

[6] *Id.* at 5 (Deed of Trust).

[7] *Id.*

3

obligation to repay such amounts may be or hereafter may become otherwise unenforceable.[8]

FNBA's Claim No. 25 was filed as a secured claim for $1,447,171.16. This claim is based upon a loan for $1.4 million which FNBA extended to AFG on January 13, 2004.[9] To secure this loan, FNBA obtained a second deed of trust on the Franklin Street property.[10] The deed of trust was recorded in the Juneau Recording District on January 25, 2004.[11] This document has a cross-collateralization clause which is identical to the one found in the first deed of trust.[12]

On the face pages of both claims, FNBA indicates that these two loans are secured by both real property and commercial personal property. AFG disagrees. It contends the loans are secured only by the Franklin Street property. Based upon evidence presented at the confirmation hearing, FNBA is well collateralized by the realty alone. I found that this parcel of real property was worth $3.585 million and that it would increase in value to more than $4 million by 2014.[13]

FNBA has attached copies of three documents to Claims Nos. 25 and 27 in support of its contention that these two debts are also secured by AFG's commercial personal

---

[8] *Id.* (emphasis in original).

[9] FNBA's Claim No. 25-1, filed Jun. 1, 2009, at 3 (Promissory Note).

[10] *Id.* at 7 (Deed of Trust).

[11] *Id.*

[12] *Id.*

[13] Supplemental Confirmation Mem., filed Jul. 29, 2011 in Main Case No. A09-00196-DMD (Docket No. 390), at 7-8.

property. First, it has provided a copy of a commercial security agreement dated March 18, 2002, between itself and AFG.[14] To secure a loan for $500,100.00, AFG granted the bank a security interest in all of its inventory, chattel paper, accounts, equipment and general intangibles, as well as the proceeds and products thereof.[15] The agreement contains a cross-collateralization clause substantially identical to the one found in the two deeds of trust.[16] The purpose of this loan, No. 4149, was to provide AFG with financing to acquire inventory for its retail operations.[17] AFG alleges that it paid off its last inventory loan in 2004, has not had any amounts owing under Loan 4149 since then, and that FNBA has not filed a claim based upon this loan.[18] FNBA admits that there are no amounts owing on the loan and that it has not filed a proof of claim based upon it.[19] However, Claims Nos. 25 and 27 rely upon the cross-collateralization clause in this 2002 security agreement to assert a security interest in AFG's business personal property.[20]

FNBA's claims also include copies of two UCC filings. The earliest is a UCC-1 financing statement bearing a recording date of April 16, 1993, and recording number

---

[14] FNBA's Claim No. 25-1 at 22; Claim No. 27-1 at 20.

[15] *Id.*

[16] *Id.*

[17] AFG's Compl. to Determine Lien, filed Jan. 11, 2010 (Docket No. 1), at ¶17. FNBA admits this allegation. FNBA's Ans., filed Jan. 26, 2010 (Docket No. 4), at 1.

[18] AFG's Compl. (Docket No. 1), ¶20.

[19] FNBA's Ans., filed Jan. 26, 2010 (Docket No. 4), at 2 ¶(e).

[20] AFG's Compl. (Docket No. 1), at ¶27; FNBA's Ans. (Docket No. 4), at 1.

"365152."[21]  It names AFG as the debtor and FNBA as the secured party.[22]  The financing statement covers the following types of property: "all goods comprising equipment and inventory, and all accounts and chattel paper, in which the debtor now has or hereafter acquires rights.  All proceeds and products of the collateral are also covered."[23]  A handwritten note at the bottom of the financing statement states, "expires 4/16/98."[24]

The second UCC filing the bank has provided is a continuation statement showing a recording date of March 10, 2008."[25]  This document references an initial financing statement file number of "000-365152-0."[26]  The number "365152" matches the recording number for the 1993 UCC-1.  FNBA has not provided copies of any other interim UCC-3 continuation statements.

FNBA relies upon one additional document to support its contention that Claims Nos. 25 and 27 are secured by AFG's business personal property - a commercial security agreement dated January 28, 2008.[27]  This agreement secures a loan in the principal sum of $1.6 million.[28]  The borrowers under the agreement are Hernandez & Associates, LLC

---

[21] FNBA's Claim No. 25-1 at 21; Claim No. 27-1 at 19.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] FNBA's Claim No. 25-1 at 20; Claim No. 27-1 at 18.

[26] *Id.*

[27] FNBA's Ans., filed Jan. 26, 2010 (Docket No. 4), at 3-4, Ex. A.

[28] *Id.*, Ex. A.

("H&A") and AFG, but the "Grantor" of the security interest is defined as H&A alone.[29]  The collateral given for the loan is "all inventory, chattel paper, accounts, equipment and general intangibles," as well as any proceeds and products thereof.[30]  FNBA alleges that its security interest in the property of H&A was perfected by the filing of a financing statement in February of 2005, and that it perfected its interest in AFG's business personal property by the filing of the April 16, 1993 financing statement referenced above, and of continuation statements filed thereafter.[31]

The Parties' Arguments

AS 45.29.204(c) permits a security agreement to "provide that collateral secures . . . future advances or other value, whether or not the advances or value are given pursuant to a commitment."[32]  FNBA relies on the cross-collateralization clause in the 2002 commercial security agreement and AS 45.29.204(c) to support its contention that Claims Nos. 25 and 27 are secured by AFG's business personal property.[33]  The bank also cites Official Comment 5 to U.C.C. § 9-204, the corresponding subsection of the Uniform Commercial Code, which states:

---

[29] *Id.*  The same family members who own AFG also own H&A, a related entity.  H&A executed the agreement as both grantor and borrower; AFG executed the document as a borrower only.

[30] *Id.*

[31] FNBA's Ans. (Docket No. 4), at 3-4.

[32] AS 45.29.204(c) (2011).

[33] FNBA's Mot. for Judgment, filed Feb. 17, 2010 (Docket No. 8), at 10-14.

> **Future Advances; Obligations Secured.** Under
> subsection (c) collateral may secure future as well
> as past or present advances if the security
> agreement so provides. This is in line with the
> policy of this Article toward security interests in
> after-acquired property under subsection (a).
> Indeed, the parties are free to agree that a security
> interest secures any obligation whatsoever.
> Determining the obligations secured by collateral
> is solely a matter of construing the parties'
> agreement under applicable law. This Article
> rejects the holdings of cases decided under former
> Article 9 that applied other tests, such as whether
> a future advance or other subsequently incurred
> obligation was of the same or a similar type or
> class as earlier advances and obligations secured
> by the collateral.[34]

AFG notes that the 2002 loan was "altogether different" from the two subsequent loans which are secured by the Franklin Street property and the subjects of Claims 25 and 27.[35] It urges application of the Alaska Supreme Court's holding in *Lundgren v. National Bank of Alaska*[36] to find that its business personal property is not collateral for the two subsequent loans.

In *Lundgren*, the bank held a second deed of trust against commercial real property. The deed of trust contained a dragnet clause which provided that it would secure payment not only of the loan given but also:

---

[34] U.C.C. § 9-204 cmt. 5 (eff. Jul. 1, 2001).

[35] AFG's Opp'n to FNBA's Mot. for J.; Cross-Mot for Summ. J and Mot. for Abstention, filed Jul. 21, 2010 (Docket No. 24), at 4.

[36] 756 P.2d 270 (Alaska 1987).

8

> Any and all other indebtedness of the Trustor . . .
> to the Beneficiary, whether contingent, now due,
> or hereafter to become due, and whether
> heretofore or contemporaneously herewith or
> hereafter contracted, or whether arising by
> operation of law out of the same or different
> transactions between the parties hereto or between
> others.[37]

The court considered whether the dragnet clause should be construed to encompass prior loans which the bank had extended to the borrower. It noted that some courts referred simply to the language of the clause itself to determine the intent of the parties, but that many others instead attempted to determine the "true intent" of the parties.[38]

> Many courts, however, have refused to rely
> solely on the language of the dragnet clause and
> instead have sought to determine the "true intent"
> of the parties. Decisions adopting this approach
> have pointed out that such clauses are usually
> "boilerplate" in a document drafted by the lender,
> seldom the subject of negotiation, and often the
> debtor is unaware of its presence or implications.
> These courts often opine that although dragnet
> clauses are not invalid, they will be carefully
> scrutinized and strictly construed; the courts
> express concern that the debtor may be caught
> unaware of the indebtedness that the agreement
> secures and consequently become the "economic
> serf" of the creditors.[39]

---

[37] *Lundgren*, 756 P.2d at 271.

[38] *Id.* at 277.

[39] *Id.* (citations omitted).

The court listed a variety of approaches courts in other jurisdictions had applied to evaluate the scope of a dragnet clause.

> Some [courts] have held that debts incurred prior to the security agreement ("antecedent debts") will not come within the dragnet clause unless such debts were specifically identified in the security agreement. A key rationale underlying these holdings is that since the antecedent debt is already owed by the borrower to the lender, the parties would have had no good reason not to identify it in the subsequent security instrument if they had truly intended the deed of trust or mortgage to cover it. Several decisions have modified this rule by holding that if the parties expressly agree in a subsequent instrument that a security agreement containing the dragnet clause extends to an antecedent debt specifically referred to in the subsequent instrument then the dragnet clause will apply to the antecedent debt.

> Courts have also expressed the view that "other debt" is not encompassed by a dragnet clause unless it is of the same type or character as the debt explicitly covered by the security instrument containing the dragnet clause or unless the other loan specifically refers to the prior mortgage or deed of trust containing the dragnet clause. Some courts also inquire as to whether the "other debt" is separately secured. If it is, and does not refer back to the mortgage or deed of trust containing the dragnet clause, it is considered evidence that the parties did not intend the dragnet clause to apply to that debt.[40]

---

[40] *Id.* at 278 (citations omitted).

10

The court in *Lundgren* adopted these considerations and concluded that the dragnet clause at issue did not apply to the antecedent debt because it was not specifically identified in the deed of trust.[41]  It found the bank's arguments that imposition of such a requirement would be burdensome and detrimental to commercial lending institutions unpersuasive.[42]

      *Lundgren* is distinguishable from the instant case because it dealt with a dragnet clause in a deed of trust and involved an antecedent debt.  AFG contends these differences are not significant.  It concedes that AS 45.29.204(c) permits a security agreement to secure future advances, but argues that the court can still look to the intent of the parties to determine the scope of a cross-collateralization provision.  AFG says Comment 5 to the UCC permits this, because it states that "[d]etermining the obligations secured by the collateral is solely a matter of construing the parties' agreement under applicable law."[43]  Further, AFG notes that the court in *Lundgren* provided some guidance on how it would evaluate the impact of a dragnet clause on future advances:

> We also believe that dragnet clauses should be carefully scrutinized and strictly construed with respect to their coverage of future advances.  In light of the authorities previously cited, the following guidelines should be adhered to in determining whether future advances are secured by a particular dragnet clause.  First, the burden is upon the proponent of the clause to demonstrate that the parties intended that the future advance or "other debt" would be secured by the dragnet clause.  Second, the fact that the

---

[41] *Lundgren*, 756 P.2d at 278.

[42] *Id.* at 279.

[43] AFG's Opp'n (Docket No. 24), at 6 (*citing* U.C.C. § 9-204 cmt. 5).

other debt is not of the same type or character as the debt explicitly covered by the deed of trust or mortgage containing the dragnet clause is evidence that the parties did not intend the dragnet clause to cover it.  Third, the fact that the other debt is separately secured and does not refer back to the mortgage or deed of trust which contains the dragnet clause is also evidence that the parties did not intend the dragnet clause to apply to that debt.[44]

AFG argues that these tests should be applied to determine the scope of the cross-collateralization clause in the 2002 security agreement and that the true intent of the parties should be determined.  It points to the following as evidence of the parties' intent here:

-  the affidavit of Manuel Hernandez, the AFG officer who executed the documents for the two Franklin Street loans, which states that when the two loans were made there was no discussion that they would be secured by business personal property;

-  FNBA's commercial loan information sheets for the two Franklin Street loans describe the collateral for the loan as the real property only, and none of the UCC boxes are checked;

-  when the Franklin Street loans were made, FNBA made no effort to value AFG's business personal property;

-  the Franklin Street loans are "very adequately secured" by the Franklin Street property; and

-  in connection with two subsequent loans FNBA extended to AFG, which are secured by another parcel of Juneau real property, security agreements were executed contemporaneously with the deeds of trust, and the bank's commercial loan

---

[44] *Lundgren*, 756 P.2d at 279.

12

information sheets specifically referred to both real property and inventory as collateral.[45]

FNBA counters that the analysis in *Lundgren* is limited to deeds of trust. It notes that a factor of "controlling significance" to the court in *Lundgren* was the protection junior lienholders would receive if antecedent debts included in a deed of trust's dragnet clause were specifically identified on the document.[46] There is no corresponding requirement under the UCC; a financing statement provides notice of the security interest alone. Further, in *Lundgren* the court declined to apply state recording, lien and UCC statutes because it felt they were irrelevant to the issue at hand.[47] FNBA submits that Claims Nos. 25 and 27 provide all the documentation needed to establish its security interest in AFG's business personal property and that AS 45.29.204(c) and Comment 5 control here.

Discussion

Although the *Lundgren* decision evaluated a dragnet clause in a deed of trust, many courts have applied the same analysis in the UCC context. For example, in *In re Wollin*,[48] a credit union asserted that credit card charges incurred by the debtors were secured by vehicles they had purchased earlier through the credit union. In connection with the vehicle loans, the debtors had signed security agreements that contained dragnet clauses. These clauses stated that the security interest being granted would cover not only the vehicle

---

[45] AFG's Opp'n (Docket No. 24), at 10-11.

[46] *See Lundgren*, 756 P.2d at 278.

[47] *Lundgren*, 756 P.2d at 279.

[48] 249 B.R. 555 (Bankr. D. Or. 2000).

13

loans, but also "any other advances" which the debtors had or would receive in the future, and "any other amount [the debtors] owe the credit union for any reason now or in the future."[49]

The bankruptcy court rejected the credit union's argument. It applied "well-settled" Oregon law which required that a future advance "be of the same class as the primary obligation . . . and so related to it that the consent of the debtor to its inclusion [in the security agreement] may be inferred."[50]  The fact that the loans fell into the same general category of "consumer loans" was insufficient to place them in the same class; they were not made for the same general purpose and thus were not of the same class.[51]  Further, the credit card debt was not so related to the vehicle loans that the consent of the debtors as to their inclusion in the security agreement could be inferred.[52]

In *Wollin*, the debtors also had antecedent debt which the credit union contended was secured by the dragnet clauses in the vehicle loans.  The bankruptcy court, citing *Lundgren* with approval, rejected this claim as well.  Like the Alaska Supreme Court, it noted that dragnet clauses "are generally disfavored and strictly construed," and held that the antecedent debts would not be included in the security agreements because they were not specifically referenced in those agreements.[53]

---

[49] *In re Wollin*, 249 B.R. at 557-58.

[50] *Id.* at 558, *citing Community Bank v. Jones*, 566 P.2d 470, 482 (Or. 1977).

[51] *Wollin*, 249 B.R. at 559.

[52] *Id.*

[53] *Id.* at 560.

14

Several other courts have applied these tests to analyze the scope of a dragnet or cross-collateralization clause in the UCC context.[54]  However, these cases all predate amendments to Article 9 of the UCC which were adopted nationwide in 2001.[55] AS 45.29.204 was included in these amendments, and was adopted effective July 1, 2001.[56] The impact of the UCC amendments and Comment 5 on the evaluation of dragnet clauses is discussed by the First Circuit in *Pride Hyundai, Inc. v. Chrysler Finanacial Company, L.L.C*:[57]

> Most states, including Massachusetts, [chose] not to enact the Official Commentary to Code provisions such as Article Nine.  The majority approach nonetheless tends to give "considerable weight to the comments."  The

---

[54] *See, e.g., Matter of Kazmierczak*, 24 F.3d 1020 (7th Cir. 1994)("relatedness" requirement applied to determine that 1992 advance for purchase of chemicals and fertilizer was secured due to dragnet clause in 1991 security agreement made for the same purpose); *Allegheny-Ludlum Brackenridge Fed. Credit Union v. Fassinger (In re Fassinger)*, 246 B.R. 513, 520-22 (Bankr. W.D.Pa. 2000)(although UCC permits dragnet clauses, court applied "relatedness rule"adopted by state supreme court to determine whether consent of debtor to such provision could be inferred); *W. Farm Credit Bank v. Auza (In re Auza)*, 181 B.R. 63 (B.A.P. 9th Cir. 1995)(applying "relationship of loans" and "reliance on security" tests, court concluded dragnet clause in security agreements executed by debtors individually did not extend to personal guarantees they had given to secure corporate debts); *In re Kim*, 256 B.R. 793 (Bankr. S.D.Cal. 2000)("relatedness" requirement applied in both UCC and real property contexts; cross-collateralization clause in security agreement for vehicle loan did not cover subsequent credit card debt because the debts were unrelated and there was no evidence lender relied on car when it approved credit card); *Lansdowne v. Sec. Bank of Coos Co. (In re Smith & West Constr., Inc.)*, 28 B.R. 682, 683-84 (Bankr. D. Or. 1983)("relatedness" test applied to find that dragnet clause covered future advances to corporate debtor engaged in the construction business where all loans were evidenced by promissory notes and of a commercial nature; fact that subsequent security agreements were executed did not affect the coverage of the initial agreement); *Blair v. Memphis Bank & Trust Co. (In re Blair)*, 26 B.R. 228, 229-30 (Bankr. W.D.Tenn. 1982)("same class" and "relatedness" tests applied to determine scope of dragnet clauses).

[55] *Pride Hyundai, Inc. v. Chrysler Fin. Co., L.L.C.*, 369 B.R. 603, 605 (1st Cir. 2004) ("In July 2001, Massachusetts, along with virtually every other state, revised Article Nine of its commercial code.").

[56] § 1 Ch. 113 SLA 2000.

[57] 369 F.3d 603 (1st Cir. 2004).

15

[Massachusetts Supreme Judicial Court] follows this majority viewpoint, routinely treating Official Comments to the Code that have not been enacted as highly persuasive authority . . . .

Use of [Comment 5] here would mean that the Massachusetts cases analyzing dragnet clauses – all of which consider real estate mortgages . . . – are inapplicable in the Article Nine context. These real estate cases have specifically used the approach repudiated by the Official Comment, construing dragnet clauses "to apply only to debts of the general kind of those specifically secured, or which bear a sufficiently close relationship to the original indebtedness, that the [c]onsent of the debtor can be inferred." Although these cases interpreted dragnet clauses contained in mortgages of real property, some courts elsewhere . . . had found that similar principles applied in the Article Nine context.

Ultimately, our role in this diversity case is to predict what the Massachusetts Supreme Judicial Court would do if it were faced with this issue. We think the SJC would adopt the approach to dragnet clauses in the Article Nine context that is contained in the Official Commentary to the revised Code. The parties in transactions involving dragnet clauses are typically sophisticated market actors. Commercial parties on both sides of a transaction may have good reasons to enter into a security agreement that secures not only present liabilities but also future liabilities of a different class or type. Such an arrangement allows future credit to be extended between the parties on a secured basis without the additional transaction costs that would accompany the execution of a new agreement for each such transaction.

16

Additionally, the approach set forth in the Official Commentary provides the benefit of greater certainty to sophisticated commercial actors about the circumstances in which dragnet clauses will be enforced.  One of the primary shortcomings of comparing types of debt is that the inquiry is inherently uncertain.  Commercial parties place considerable value on having a clear set of legal background rules against which to order their affairs.[58]

The First Circuit also noted that another significant amendment had been made to Article 9 – the definition of good faith had been expanded to include "the observance of reasonable commercial standards of fair dealing."[59]  Considering the UCC amendments as well as the fact that the Massachusetts cases interpreting dragnet clauses dealt with real property interests and predated the UCC amendments, the court concluded that the Massachusetts SJC would adopt the approach articulated in Comment 5 and "construe the parties' agreement under applicable law."[60]  Under controlling state law, absent an ambiguity in wording, the contract would be enforced according to its terms.[61]  The First Circuit found that the language in the dragnet clause at issue was "unambiguous:  all future and past debts, without exception, are secured under the plain meaning of the clause's terms."[62]  It held that the clause applied to all debts between Pride Hyundai and its commercial lender, regardless

---

[58] *Pride Hyundai*, 369 F.3d at 614-15 (citations omitted).

[59] *Id.* at 606, *citing* U.C.C. § 9-102(43).

[60] *Id.* at 615.

[61] *Id.* at 616.

[62] *Pride Hyundai*, 369 F.3d at 616.

17

of Pride Hyundai's contention that it did not subjectively have this intention.[63]  Evidence of subjective intent would only be permissible if the agreement was uncertain or equivocal.[64]  Further, the court found that the dragnet clause did not violate the duty of good faith as articulated under the revised UCC.  It concluded that reasonable commercial standards of fair dealing were not violated simply because the bank had greater negotiating leverage than its commercial borrower.[65]

There are many similarities between *Pride Hyundai* and the instant case.  The applicable UCC amendments are identical in both.  The applicable state law dealing with dragnet clauses was decided in the real estate arena rather than the UCC context and predates the UCC amendments.  Because there is no controlling state law, this court must, like the First Circuit, predict how the highest state court would rule on the issue.[66]  The Alaska Supreme Court has often found the Official Comments persuasive when determining issues arising under the Alaska Uniform Commercial Code.[67]  As noted above, Comment 5

---

[63] *Id.*

[64] *Id.*

[65] *Id.* at 616-17.

[66] *Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1045-46 (9th Cir. 2001); *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 663 n.10 (9th Cir. 1998), *citing Erie R.R. Co. v. Thompkins*, 304 U.S. 64, 58  (1938); *C.I.R. v. Estate of Bosch*, 387 U.S. 456, 465 (1967) (in absence of controlling state court precedent, federal court is "*Erie*-bound" to apply the law as it believes state court would do under the circumstances.).

[67] *See, e.g., Palmer G. Lewis Co. v. ARCO Chem. Co.*, 904 P.2d 1221, 1229 (Alaska 1995)(in considering whether a contract had been materially altered, court looked to the Official Comments for examples of provisions which were material); *Dischner v. United Bank Alaska*, 725 P.2d 488, 489-90 (Alaska 1986)(court referred to Official Comments when deciding whether wholesale or retail value should be used to value repossessed collateral); *Shooshanian v. Wagner*, 672 P.2d 455, 462 (Alaska 1983) (Official Comments considered when court determined whether a complaint filed by a consumer satisfied statutory notice requirement of AS 45.02.607(c)(1)).

explicitly rejects the tests courts had previously applied to evaluate dragnet clauses, such as "whether a future advance or other subsequently incurred obligation was of the same or a similar type or class as earlier advances and obligations secured by the collateral."[68] Instead, the comment states that parties can agree "that a security interest secures any obligation whatsoever," and that the determination of the scope of the security agreement "is solely a matter of construing the parties' agreement under applicable law."[69]

        In interpreting contracts, Alaska courts "look to extrinsic evidence of the parties' contractual intent only if the language of the instrument is ambiguous."[70] The cross-collateralization provision at issue here is not ambiguous.  It provides that the security agreement covers all of AFG's obligations, debts and liabilities to FNBA, "whether now existing or hereafter arising, [and] whether related or unrelated to the purpose of the Note.[71] Further, this provision is not buried in the fine print.  It appears on the first page of the agreement, and the header "cross-collateralization" is both capitalized and bolded.  The agreement is clear; it covers both existing and future debts, whether they are related or not. This was a commercial transaction and the parties are held to a higher level of sophistication than in a consumer transaction.[72]  Finally, AFG's argument regarding intent of the parties can

---

[68] U.C.C. § 9-204 cmt. 5.

[69] *Id.*

[70] *AAA Valley Gravel, Inc. v. Totaro*, 219 P.3d 153, 160 (Alaska 2009); *see also Norville v. Carr-Gottstein Foods Co*., 84 P.3d 996, 1004 (Alaska 2004)(extrinsic evidence is permitted when the contract itself is reasonably susceptible to conflicting interpretations).

[71] FNBA's Claim No. 25-1 at 22; Claim No. 27-1 at 20.

[72] *Shooshanian v. Wagner*, 672 P.2d at 462 (a more rigorous standard is applied in commercial dealings than in ordinary consumer transactions).

be viewed two ways.  AFG says FNBA knew how to request a security interest in inventory when it wanted to, and refers to subsequent loans the bank extended which were collateralized, contemporaneously, by both real property and security interests in AFG's business personal property.   However, FNBA's failure to have AFG enter security agreements when it extended the two Franklin Street loans could also be viewed as an oversight by FNBA or an assumption on FNBA's part that its earlier agreement would provide it with this protection.[73]  This view is particularly persuasive in light of the fact that FNBA had recorded a UCC-1 as early as 1993, evidencing a security interest in all of AFG's goods, including equipment, inventory, accounts and chattel paper.

Because this dispute is between two sophisticated parties in a commercial context, I believe the Alaska Supreme Court would consider and apply Comment 5 when evaluating the dragnet clause at issue here.  The comment is clear that tests similar to the ones the Alaska Supreme Court applied in *Lundgren* should not be applied when determining the scope of a dragnet clause.  Instead, basic principles of contract interpretation must be followed.  If the contract is unambiguous, its terms will control.  The cross-collateralization clause in AFG's 2002 commercial security agreement is unambiguous.  It applies to future debts of AFG, even if they are unrelated to the purpose of the 2002 loan.  I therefore find that Claims Nos. 25 and 27 are secured by both the Franklin Street property and AFG's business personal property.

My conclusion here is limited to commercial transactions.  Consumer debtors are held to a less stringent standard than commercial debtors.  In a consumer transaction,

---

[73] *See Matter of Kazmierczak*, 24 F.3d at 1021-22 (dragnet clause was a "hedge" against parties' failure to execute a new security agreement each year in connection with crop financing).

courts may still look to the "true intent" of the parties.[74] Other considerations, such as good faith, overreaching or unconscionability, might also alter the outcome.[75] These are issues left for another day.

<u>Conclusion</u>

For the reasons stated above, I find that Claims Nos. 25 and 27 filed by FNBA are secured by both the Franklin Street property and AFG's business personal property. An order and judgment will be entered consistent with this memorandum.

DATED:  September 28, 2011

BY THE COURT

 /s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:  C. Christianson, Esq.
G. Spraker, Esq.
J. Beard, Esq.
B. Moore, Esq.

9/28/11

---

[74] *In re Keeton*, 2008 WL 686938 (Bankr. M.D.Ala. 2008)(where security agreement defined "Debtor" as both of the joint debtors, parties could not have intended dragnet clause to secure the individual and separate obligations of just one of the debtors); *Wooding v. Cinfed Emps. Fed. Credit Union*, 872 N.E.2d 959 (Ohio App. 1st Dist. 2007)(credit card issuer engaged in unfair lending practices when it held debtors' automobile title as collateral for credit card debt; there was no evidence that the parties had a meeting of the minds on this issue); *Waddle v. State*, 167 S.W.3d 664 (Ark. 2004)(true intent and relatedness tests applied; dragnet clause in security agreement executed by three debtors did not cover subsequent loan issued to just one debtor individually).

[75] *See* Ryan A. Hackney, *Ripping Holes in the Dragnet:  The Failings of U.C.C. § 9-204(c) as Applied to Consumer Transactions*, 87 Tex. L. Rev. 1249 (2009).